A. Harry Wyman v. Commissioner.
Wyman v. Commissioner
Docket No. 22299.
United States Tax Court
1950 Tax Ct. Memo LEXIS 157; 9 T.C.M. (CCH) 566; T.C.M. (RIA) 50172; June 30, 1950
*157 James R. Murphy, Esq., 902 American Security Bldg., Washington, D.C., and Joseph Hartman, Esq., for the petitioner. N. A. Townsend, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Petitioner assails respondent's determination of deficiencies in income tax for the years 1941, 1942, and 1943 of $1,270.50, $24,498.18 and $29,253.28, respectively, and respondent's determination for the same years of 50 per cent fraud penalties under section 293 (b), Internal Revenue Code, in the amounts of $635.25, $12,249.09, and $14,626.64, respectively. The issues are whether respondent correctly determined petitioner's income by the "net worth" method, and whether any part of any deficiency is due to fraud with intent to evade tax. Findings of Fact Petitioner, a resident of Jacksonville, Florida, filed his returns for the years 1941 to 1943, inclusive, with the collector of internal revenue for the district of Florida. Petitioner served in the Canadian Army during the First World War. About 1920 he settled in Miami, Florida, where he engaged in gambling activities and traded in jewelry. In 1922 he met Pearl Lehman, *158 who resided in Jacksonville, Florida. Until 1932 she had been employed for many years, including eleven years in one secretarial position where her wages ranged from $30 to $45 per week. Thenceforth she was not employed until 1942 when she began to work in one of petitioner's enterprises. In 1934 petitioner and Miss Lehman married. Thereafter they resided continuously in Jacksonville where petitioner engaged in horse race betting and bookmaking. Petitioner has had numerous bank accounts located in various cities. Upon several occasions he opened new accounts for short periods at Jacksonville banks to deposit sums involved in isolated transactions. He conducted many transactions through the use of cashier's checks. He maintained in Jacksonville the following safety deposit boxes: Depository
Date of Rental
Date of Surrender
Florida National Bank
March 16, 1935
Sept. 12, 1936
Barnett National Bank
Sept. 12, 1936
July 16, 1942
Vault Company
Sept. 11, 1939
July 2, 1947
From May 7, 1928, through the period here involved, Mrs. Wyman rented a safe deposit box at the Florida National Bank in Jacksonville. From May 7, 1928, until October 29, 1931, B. J. McCoole *159 was authorized to enter her box, and the safe deposit entry records of that bank contain entries indicating that the latter opened the box on January 22, 1929. From October 29, 1931, until February 8, 1946, Mrs. Wyman alone had authority to enter the box. Upon the latter date petitioner was granted similar authority. On August 11, 1939, petitioner and Mrs. Wyman rented a safe deposit box at the Vault Company in Jacksonville, to which both had access, and which was surrendered on July 12, 1940. During the years 1926 to 1943 Mrs. Wyman opened and closed savings accounts with Jacksonville banks, frequently withdrawing the interest as it accrued, and maintaining varying balances, as follows: Acct.
Minimum
Maximum
Bank
No.
Date Opened
Date Closed
Bal.
Bal.
Florida National Bank
43099
Jan. 3, 1925
Jan. 4, 1937
$ 130.00
$2,529.80
Central Savings Bank of
Florida
41655
Jan. 2, 1934
Apr. 6, 1938
1,000.00
1,020.00
Florida National Bank
83635
Jan. 4, 1937
1,000.00
6,000.00
Central Savings Bank of
Florida
14109
Jan. 31, 1941
Jan. 12, 1943
1,000.00
1,010.00
Florida National Bank
94665
May 26, 1941
Apr. 13, 1942
1.00
1,101.00
First Federal Savings
& Loan
Assn. of Jacksonville
481
Jan. 18, 1941
5,000.00
5,000.00
*160 In 1929 Mrs. Wyman held Florida municipal bonds with an aggregate face value of $25,000, and in 1930 she held similar bonds with total face value of $50,000. At various times prior to 1941 she purchased and sold bonds in transactions from which she received cash in the net amount of $8,376.98. The bonds carried interest rates varying from 5 to 6 per cent, and the maximum interest receivable from the bonds between January 1, 1929, and January 1, 1941, was $29,050. On December 31, 1940, she held bonds with a total face value of $42,000. In 1941 she sold or redeemed bonds in the face amount of $11,000. She deposited at least $10,000 of the proceeds in her savings accounts, making two deposits of $5,000 each in her accounts at the Florida National Bank and the First Federal Savings & Loan Association of Jacksonville. On December 31 of 1941, 1942, and 1943 Mrs. Wyman held bonds having face value of $31,000. The maximum interest received during the years 1941, 1942, and 1943 was $1,775, $1,650, and $1,650, respectively. From October 21, 1936, through the year 1943, Mrs. Wyman maintained a checking account at the Florida National Bank, which she used for household and personal expenses *161 and in which she deposited interest from the bonds as well as sums given to her by petitioner for personal and household expenditures. The bank ledger sheets of that checking account show total deposits, and balances at the end of each year, as follows: Balance
Year
Deposits
on Dec. 31
1936
$1,355.19
$438.84
1937
4,335.00
465.26
1938
4,622.75
358.47
1939
3,231.91
109.17
1940
1,363.95
223.57
1941
2,871.83
172.78
1942
2,444.40
144.59
1943
1,580.00
486.03
In 1937 petitioner negotiated a $500 loan at the Barnett National Bank, secured by a chattel mortgage on his automobile. In 1938 he negotiated a $300 loan from the same bank upon the same security. The ledger sheets of the loan account in petitioner's name at that bank indicate that each of those loans bore 8 per cent interest and were repaid in payments of $50 per month. During the taxable years here involved petitioner operated a "bookmaking" establishment, maintaining a regular place of business with several employees, and keeping books of account and other records. The bookkeeping system was designed to operate as follows: Bets were recorded on a "daily sheet" kept for each bettor. *162 The results of the transactions for the day with each bettor were entered in a calendar "diary." The final gain or loss from the transactions of each day was entered in a cash journal together with entries of other cash transactions including payments for wages, commissions, various expenses and the like. These journal entries were then posted to a ledger. The daily sheets and the calendar diary were kept primarily by petitioner's employees at his place of business, although some daily sheets were kept by petitioner. The calendar diary entries were recorded in the journal and posted to the ledger about once or twice a week by petitioner's bookkeeper. The latter never had access to or checked the cash. Except for some disbursements which were made through the mails by check, petitioner handled personally all cash receipts and cash payments involved in his gambling operations. Petitioner's records contain a number of daily betting sheets for various dates in September and October, 1941, marked "Office Played and Layed," or "Office Played," reflecting transactions resulting in an aggregate gain of $4,219.75, which were not entered in the diary or in the other books of account. The books *163 of the gambling business show losses during the period between September 11, 1942, to October 14, 1942, totaling $28,724.95, to individuals named Henry (or Herman or H.) Weinstein, Sam Berman, Mr. Ruben, and A. Marcus, who are not known to other persons in the gambling business in Jacksonville. The daily betting sheet of September 12, 1942, showing gambling losses aggregating $3,302.75 to Weinstein, was written by petitioner. Petitioner did not make payments to those persons by check. The books of the gambling business show losses during the period between April 17, 1943, to May 5, 1943, totaling $9,765, to individuals named Herby R., Benny D., Joe Mendel, Danny W. and Joe Nelson, who are not known to other persons in the gambling business in Jacksonville. Petitioner did not make payments to them by check. Petitioner's gambling business included the acceptance of bets on football games, which were recorded on sheets similar to those used for racing bets. Petitioner's records contain three sheets, dated November 29, 1941, reflecting bets on football games resulting in gains to petitioner totaling $175.65. The "daily calendar" shows no entries reflecting such transactions. The books *164 of account of the gambling business do not contain entries reflecting football wagers. During the year 1942 petitioner acquired a jewelry business known as the "Jacksonville Jewelry Trade Shop," for which there was kept a double-entry set of books, including a journal, ledger, and cash book. The books show petitioner's capital in the business on January 1, 1943, and December 31, 1943, to be $3,442.90 and $4,768.90, respectively, and that the business owed petitioner the sum of $500 on December 31, 1943. In October 1942 petitioner opened a retail jewelry business, known as "Wyman's Jewelers," for which there was kept a double-entry set of books on the accrual basis, including a journal, general ledger, and cash book. The books contain an "investment account" and a "loan account" which, together, showed outstanding balances credited to petitioner on December 31, 1942, and December 31, 1943, of $37,366.13 and $56,753.73, respectively. The records and books for all of petitioner's businesses were kept by his bookkeeper, Forrest Mitchell, who became his full-time employee in 1942. The books of Wyman's Jewelers contain entries crediting the sum of $301.01 to an expense account for *165 1943 and $353.59 to an "insurance deferred" account, as the result of a disbursement by check, dated June 23, 1943, in the amount of $654.60, in payment of part of a premium of a life insurance policy, dated June 23, 1943, on petitioner's life in favor of Wyman's Jewelers or its successors or assigns. In 1943 Wyman's Jewelers made payments on account of petitioner's income tax, in the total amount of $5,250, by two checks drawn to the order of the collector of internal revenue. The books of Wyman's Jewelers disclose a cash disbursement on November 24, 1943, of $5,000, representing an exchange or cashier's check in that amount, which Mitchell purchased and forwarded to petitioner in New York. A debit entry to the purchase account was recorded on the books. The records of the business and of petitioner contain no invoices respecting that transaction. Petitioner's returns for 1942 and 1943 were prepared by Robert Rieders, a certified public accountant, who used information regarding the gambling business furnished by petitioner or Mitchell, book data respecting the jewelry business, and inventory figures furnished by petitioner or Mitchell. On December 8, 1943, Rieders delivered a report *166 from the books and records to petitioner, at the latter's request, on the operations of Wyman's Jewelers for the period January 1, 1943, to October 31, 1943, which showed a net profit for that period of $4,680.30. On or about January 1, 1944, an inventory was undertaken but not completed. The correct inventory of Wyman's Jewelers at December 31, 1943, was $61,878.43. On April 1, 1944, Mitchell furnished to Rieders an inventory figure for December 31, 1943, of $52,677.47, which represented the result of an actual inventory taken on March 1, 1944, understated by $100 because of a mathematical error. That figure was taken as the inventory value as of December 31, 1943, on petitioner's 1943 return. $61,878.43 was reported to be the value of inventory as of December 31, 1943, on the 1944 return. The following is a schedule of the balances in bank accounts of petitioner during the periods in question: Bank
12/31/40
12/31/41
12/31/42
12/31/43
American National Bank
$1,039.52
$3,759.05
Atlantic National Bank
$ 35.83
$ 847.91
570.87
Atlantic National Bank
55.00
Barnett National Bank
400.00
903.76
488.40
32.10
Florida National Bank
104.15
2.85
2.85
Florida National bank
1,246.62
1,080.10
292.25
1,039.82
$1,682.45
$2,935.92
$2,393.90
$4,888.82
*167 The ledger sheets of a loan account in the name of Mr. and Mrs. A. H. Wyman at the Florida National Bank show that during the years 1938 to 1941, inclusive, petitioner and his wife made numerous loans and repayments at the bank, owing balances at various times during that period ranging from $150 to $1,916.26. They owed $1,000 on December 31, 1940, and closed out their loan account in that bank on May 7, 1941. During the year 1941 petitioner obtained two loans of $1,000 each, with bonds as collateral, from the Barnett National Bank, which were repaid during the same year. The ledger sheet of the loan account in petitioner's name at that bank indicates that petitioner's greatest indebtedness to the bank at any time during the year 1941 was $1,000, and does not show any indebtedness at the beginning or end of the year 1941. The liability ledger records of the Atlantic National Bank show that during the year 1943 petitioner made loans at the bank, using bonds as collateral. He owed $6,000 to that bank on December 31, 1943. During the period in dispute petitioner purchased and held United States Defense Savings Bonds. The year of purchase and the total cost of the bonds acquired in *168 each of those years are as follows: 1941 - $318.75; 1942 - $1,106.25; 1943 - $3,825. In November or December 1943 petitioner invested $6,000 in Lenak Studios, a photographic studio in Jacksonville operated by Jack Kanel. Petitioner owned a one-third interest of $6,000 in the business as of December 31, 1943. In December 1943 petitioner loaned $1,000 to Kanel, which the latter repaid in 1944. On July 25, 1939, petitioner and his wife purchased a residence at 1006 Holly Lane, Jacksonville, for $12,500, making a cash payment of $1,583.46 and trading in two lots which had been held by Mrs. Wyman in her own name, and assuming a mortgage of $9,950.99, bearing interest at 5 per cent, and payable $91.92 per month. Monthly payments totaling $1,391.16 were made during 1939 and 1940 upon the mortgage. Cash payments were made on the residence for insurance, taxes, and upon the mortgage during the years in dispute, as follows: $838.35 in 1941; $778.51 in 1942; and $612.58 in 1943. On July 3, 1941, petitioner purchased from the Dixie Motor Company in Jacksonville a new 1941 Lincoln sedan for $3,319, receiving an allowance of $2,019 for a 1940 Lincoln-Zephyr sedan, and making a cash payment *169 of $1,311.50, which included the sum of $11.50 for a license plate and certificate of title. Petitioner did not file a personal property tax return on January 1, 1941, but he filed personal property tax returns with the Tax Assessor for Duval County, Florida, on January 1, 1942, and January 1, 1943. His return on January 1, 1942, listed household goods and personal effects valued at $2,700. His return on January 1, 1943, listed stocks of merchandise, business furniture and fixtures, and other tangible personal property valued at $11,500. During the taxable years involved petitioner spent no less than $3,000 per year on personal living expenses. During the period in dispute petitioner made various personal expenditures by personal checks in the following amounts: $2,915.17 in 1941, of which no more than the sum of $113.60 represented payments for food and clothing; $3,634.80 in 1942, of which no more than the sum of $86.86 represented payments for food and clothing; and a total of $1,945.18 in the year 1943, none of which represented payments for food and clothing. A certificate of assessments and payments for Pearl Lehman from records of the collector for the district of Florida *170 shows the following: No record for the years 1917 through 1920; filing of tax returns and payments of tax for the years 1921 through 1929, inclusive, in the amounts of $16.80, $23.80, $12.64, $10.80, $2.47, $5.14, $7.40, $8.22, and $2.48, respectively; no payments of tax in the years 1930 to 1932, inclusive; no records for the years 1933 through 1942. Mrs. Wyman filed a return for 1943 which reported as her sole income the receipt of $1,300 in salary from Wyman's Jewelers. Petitioner filed no tax returns for years prior to 1936. He filed returns for the years 1936 to 1940, which reported net income of $1,003.65 for 1936, and net losses for the years 1937 to 1940, inclusive, of $5,864.70, $974.95, $615.85, and $9,770.59, respectively. Petitioner's tax returns for the years which are in dispute reported the following: 1941
1942
1943
Net profit (or loss) from business
Games of chance and speculation
$ (5,871.65)
$ (6,054.80)
$18,877.51
Wyman's Jewelers
667.37
(2,520.05)
Jacksonville Jewelry Trade Shop
(81.76)
1,326.00
$ (5,871.65)
$ (5,469.19)
$17,683.46
Less: Deductions
Interest
380.79
Taxes
72.06
Carry-over operating loss
11,340.84
None
None
$11,793.69
Net income (or loss)
$ (5,871.65)
$ (5,469.19)
$ 5,889.77
*171 In 1947 petitioner was indicted for income tax evasion. He entered a plea of nolo contendere and paid a fine of $5,000. The books and records maintained by petitioner do not completely, clearly, and truly reflect petitioner's income for the periods in issue. Some part of the deficiency for each of the years in controversy was due to fraud with intent to evade tax. Opinion While, as petitioner contends, the net worth increase method is ordinarily most effective where no books of account are kept, it is likewise employed where the books are demonstrably inaccurate. Louis Halle, 7 T.C. 245, affirmed (C.A., 2nd Cir.), 175 Fed. (2d) 500, certiorari denied, 338 U.S. 949. There are several respects in which petitioner's accounts are either admittedly incorrect and deficient or so shown by unrefuted evidence, and we need not assume that all of the errors were discovered, nor, at this late date, discoverable. In that situation, the fact that the tax returns may have faithfully echoed the books is no indication that the returns were correct, and we think the net-worth-approach was properly resorted to in order to reconstruct the true income. *172 Internal Revenue Code, section 41. Petitioner has not sustained his burden of showing respondent's determination to have been erroneous. While it may be that certain inaccuracies will result from accepting respondent's figures, they are as nearly exact as any others available from the record. Petitioner's argument is ingenious. He postulates that as one engaged in the gambling business he must have possessed a considerable sum in cash. Since respondent has given him credit for none on the opening balance sheet, he asserts that the result is necessarily incorrect, and that as a consequence all subsequent computations are equally erroneous. The difficulty with the whole contention is that there was no cash account on the books. Petitioner's own statements as to the amount in his possession vary. [1] Any assumption as to the exact amount would thus be as "arbitrary" as the failure to include any cash. The best logic is to assume that if the gambling business required cash at the beginning of the taxable period, it likewise did so at the end and at all the intervening periods, and that the cash item can thus be disregarded as equalizing itself whenever we look for *173 it. We have no doubts about the necessity of sustaining the deficiencies. The assertion of fraud is, of course, more difficult. But on analysis it seems to us respondent has sustained his burden in that respect. From petitioner's own testimony at one time or another, it appears that the largest amount of undeposited cash he ever had on hand from 1936 to 1941 was between $13,000 and $20,000, and at another point that he had approximately the same amount of cash on hand in 1944 which was subsequent to the taxable years here involved. Between 1936 and 1941 his tax returns showed losses totaling $12,000, and assuming his living expenses from the period from 1936 through 1943 averaged only $3,000 a year, the total would be $24,000. These combined amounts would have eaten up not only the cash he had on hand prior *174 to 1941 but the amount he claims to have given his wife years before for safekeeping. Bearing in mind that petitioner reported the losses for two of the three years now before us, the conceded business investments of $77,223.59 made during the taxable period, to say nothing of his other assets, cannot possibly be accounted for on these hypotheses, all of which are taken from petitioner's own testimony. Since it follows from this that he must have received large amounts of unreported income from his illicit gambling business or other sources, of which from the record it is impossible that he could have been ignorant, we conclude that there is only one possible explanation, and that is that at least a part of the deficiencies in question were due to wilful concealment of taxable income for the purpose of avoiding the payment of tax. Manasse Karger, 38 B.T.A. 209; Russell C. Mauch, 35 B.T.A. 617, affirmed (C.C.A., 3rd Cir.), 113 Fed. (2d) 555. Decision will be entered for the respondent. Footnotes
1. Petitioner stated at one point that he had $35,000 to $40,000 cash on hand at the beginning of 1941; at another, that he usually carried $25,000 to $30,000 cash in his pocket to finance his gambling business; and in a statement to the Revenue Agents, that the largest amount of undeposited cash which he ever had on hand between 1936 to 1941 totalled $15,000 to $20,000.↩